UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL WOODS,

             Plaintiff,

    v.

TIM VIRGA,

             Defendant.

Case No. 13-cv-00009-VC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Michael Woods has filed a federal habeas petition challenging the validity of his conviction, following a jury trial, of first and second degree murder.  He claims the trial court violated his constitutional rights by denying his motion to sever the charges against him and by giving an improper jury instruction.  He also contends he was denied the effective assistance of trial and appellate counsel.  Because none of these claims warrants habeas relief, the petition is denied.

**BACKGROUND**

On August 2, 2010, a jury found Woods guilty of two counts of murder and two counts of being a felon in possession of a firearm.  2 Clerk's Transcript ("CT") 499-507; 7 Reporter's Transcript ("RT") 1595-97.  On August 27, 2010, the trial court sentenced Woods to a term of life without the possibility of parole plus a consecutive term of fifty years to life.  2 CT 612-15.

Woods appealed, asserting all the above-mentioned claims except for ineffective assistance of appellate counsel.  On March 27, 2012, in an unpublished opinion, the California Court of Appeal affirmed the judgment.  Ex. 8, *People v. Woods*, A129592 (Mar. 28, 2012).  On June 20, 2012, the California Supreme Court denied review.  Ex. 10.

Woods filed a petition for a writ habeas corpus in the Alameda County Superior Court, asserting claims of ineffective assistance of trial and appellate counsel.  Ex. 11.  On February 11, 2013, in an unpublished opinion, the court denied the petition.  Ex. 12, *In re Woods*, No. 157467

United States District Court
Northern District of California

1    (Feb. 11, 2013).  Woods filed petitions for a writ of habeas corpus in the California Court of

2    Appeal and California Supreme Court, both of which were summarily denied.  Exs. 15, 17.

3         On January 6, 2014, Woods filed this federal petition for a writ of habeas corpus, which is

4    now fully briefed on the merits.

5         The state court of appeal summarized the facts as follows:

6         On September 14, 2005, Oakland police found the body of Bryant Sills behind the wheel

7    of his car on 80th Avenue, near International Boulevard, in Oakland.  He died from a gunshot

8    wound near his right eye.  Experts determined that the gun was fired between one inch and four

9    feet from Sills.  The police found a 9 millimeter shell casing on the floor of the passenger side of

10   the car.  Silveria Parker saw Woods shoot Sills.  She saw Woods get out of the van he was driving,

11   walk up to the passenger side of Sills' car and shoot Sills.  Later that day, Woods found Parker,

12   pointed a gun at her, and said, "You better not say nothing, man . . . you know you have been in

13   the BART station . . ."  Parker agreed with Woods because she was afraid of him.

14        On October 4, 2005, Oakland police found the body of Reese Allen on the corner of 82nd

15   Avenue and International Boulevard in Oakland.  Allen had been shot in the chest.  In Allen's

16   back pocket, police found suspected rock cocaine packaged for sale, $40 in cash and a revolver.

17        Oakland police learned that Woods was involved in the Sills and Allen murders.  Woods

18   was in Santa Rita jail on an unrelated parole violation charge, when two police officers

19   interviewed him about the murders.  The police *Mirandized* Woods and recorded his statement,

20   which was played for the jury at his trial.  Woods stated that he went to speak to Sills about loud

21   music playing in his car and Sills "started like bendin' over, reachin' like he's pullin'—reachin'

22   for a pistol or somethin', so I panic.  I pull out my gun and I shoot him."  Woods explained that he

23   carried a 9 millimeter handgun for protection because he had been shot at in the past.

24        Woods admitted that he shot Allen, but in self-defense.  Woods stated that he went to

25   Allen to buy cocaine and saw him reach for something that was probably a gun, in his back

26   pocket.  Woods stated that he pulled out his gun and shot Allen before Allen could shoot him.

27   After he shot Allen, Woods ran into an abandoned house.

28        In 2007, when Woods was incarcerated at the Santa Rita jail, a deputy sheriff confiscated a

United States District Court
Northern District of California

2

1  note that was being passed from Woods' cell.  The note appeared to be a hit list of eight people,

2  including Parker and her boyfriend.  The note stated, "the only ones who are 'real critical' to my

3  case is . . . Parker. . . . All them other names is hear-say statements, but they still 'mention my

4  name' so they made statements period, it's all bad.  They still need to be eliminated based on ya

5  dig strategically eliminating all opposition."  The court admitted the note into evidence.  Ex. 8,

6  *People v. Woods*, A129592 at 2-5.

7                                    **LEGAL STANDARD**

8          A federal court may entertain a habeas petition from a state prisoner "only on the ground

9  that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

10  U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

11  a district court may not grant habeas relief unless the state court's adjudication of the claim:

12  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

13  established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

14  in a decision that was based on an unreasonable determination of the facts in light of the evidence

15  presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362,

16  412 (2000).

17          When there is no reasoned opinion from the highest state court to consider the petitioner's

18  claims, the court looks to the last reasoned opinion of the highest court to analyze whether the

19  state judgment was erroneous under the standard of § 2254(d*). Ylst v. Nunnemaker*, 501 U.S. 797,

20  801-06 (1991).  In this case, the California Court of Appeal is the highest court to issue a reasoned

21  decision on Woods' claims based on severance, ineffective assistance of trial counsel and an

22  improper jury instruction.  The Alameda County Superior Court is the highest court to issue a

23  reasoned decision on Woods' claim of ineffective assistance of appellate counsel.

24                                      **DISCUSSION**

25  **I. Severance**

26          Woods contends that the trial court's denial of his motion to sever the trials on the two

27  murder charges violated his Sixth and Fourteenth Amendment right to present a complete defense.

28

*United States District Court*
*Northern District of California*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### A. State Court Proceedings

A few days before trial, Woods moved for separate trials on the two murder charges. The trial court held a hearing on the motion and denied it after considering the standard for severance set out in *People v. Sandoval*, 4 Cal. 4th 155, 172-74 (1992). The Court of Appeal affirmed, finding that joining the cases did not prevent Woods from presenting a defense or cause him prejudice. *Woods*, A129592 at 6-8.

### B. Federal Authority

A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials. *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997). Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution. *Id.* To prevail, therefore, the petitioner must demonstrate that the state court's denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair. *Id.* In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000). In evaluating prejudice, the focus is particularly on the cross-admissibility of evidence and the danger of a "spillover effect" from one charge to another, especially where one charge or set of charges is weaker than the other. *Id.*; *Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir. 1998).

### C. Analysis

Woods argues here, as he did in his appeal, that joinder of the murder charges was prejudicial because his defense of self-defense was stronger in the Allen case than in the Sills case. He points out that Allen had a loaded firearm that had been fired at some point with live rounds in it, whereas no gun was found on Sills and an eyewitness testified that he shot Sills without provocation. Petition at 6. The Court of Appeal found that Woods' claim of self-defense was weak in both cases. *Woods*, A129592 at 8.

Although the evidence showed that Allen had a revolver in his back pocket, 3 RT 708-09, and that one bullet had been fired, 2 RT 444, as the Court of Appeal pointed out, no evidence showed that Allen was the person who fired it, that Woods had ever seen Allen fire it, or that it was fired immediately before Woods shot Allen. Although Woods told the police that Allen was

4

United States District Court
Northern District of California

1    known to flash a gun and "it didn't seem like he was gonna just try to flash it. It seemed like he
2    was gonna make a point, probably, this time," he never said that Allen threatened him or pulled a
3    gun or fired it. 1 CT 154. At most, Woods' statement shows that he thought Allen was probably
4    going to "make a point" of some sort. This evidence undermines Woods' argument that he had a
5    strong showing of self-defense and good reason to shoot Allen in the chest at point blank range.
6    Woods was convicted because the evidence did not support his claim of self-defense, not because
7    the charge was joined with the Sills murder charge.

8         Regarding the Sills murder case, Woods argues that no evidence explained a motive for the
9    shooting "in a manner more consistent with malice aforethought rather than perfect or imperfect
10   self-defense." Petition at 6. He argues that the reason the jury did not believe he shot Sills in self-
11   defense was because he argued self-defense in both cases, which weakened it in the eyes of the
12   jury. However, Parker's eye-witness testimony was corroborated by Woods' own statement to the
13   police that no argument or significant incident preceded his shooting Sills. 4 RT 822, 826; 1 CT
14   118-19. Although Woods told the police that he thought Sills might be reaching for a gun, he also
15   stated "I didn't even mean to shoot him . . . I was just shootin' to be shootin'." Woods was
16   convicted of murdering Sills because he had no viable defense, not because it was tried with the
17   Allen case.

18        Accordingly, Woods has not shown that the joinder of the two cases resulted in prejudice
19   great enough to render his trial fundamentally unfair or that it had a substantial and injurious effect
20   or influence in determining the jury's verdict.

21   **II. Ineffective Assistance of Trial Counsel**

22        Woods contends that his trial counsel was ineffective because he negligently allowed the
23   court to schedule the trial when his expert witness had a planned vacation so that he could not
24   testify. Woods argues the expert would have supported Woods' claim that he acted in self-defense
25   or imperfect self-defense by testifying that Woods was psychotic and suffered from a head injury.
26   Alternatively, Woods argues the trial court's refusal to grant a continuance to accommodate the
27   witness's schedule violated his due process rights.

28

United States District Court
Northern District of California

**A. Proceedings in State Court**

The Court of Appeal summarized the procedural background of this claim as follows:

> Trial began on June 15, 2010, after appellant's case had been pending for nearly five years. The parties and the court discussed the trial schedule: they agreed to try to complete jury selection and opening statements, and to begin the "evidentiary part" of the case by July 7, 2010. The prosecution would conclude its case by July 20, 2010; the defense would conclude on July 22 and the jury would begin deliberating on July 28, 2010. During jury selection, the court advised the jury that the case would likely conclude in early August 2010.
>
> On June 28, 2010, defense counsel informed the court that Dr. Douglas Tucker, the defense psychiatric expert, was scheduled to be out of the country from July 18 to August 11, 2010 and could not reschedule his trip. FN3  After expressing its concern that postponing Dr. Tucker's testimony would delay the completion of the case until late August, the court told defense counsel he could subpoena Dr. Tucker to force him to testify despite his vacation, or find a new expert. Defense counsel urged the court to allow Dr. Tucker to testify after his vacation because he had interviewed appellant, "been involved with [appellant] for over a year and a half," and had "put together his entire examination." Counsel explained that he did not have another expert and did not think it was "practical or possible" to find such an expert. He opined, "[t]here's no way anyone else can pick this up." Counsel proposed allowing the prosecution to complete its case, suspending the proceedings, and reconvening when Dr. Tucker returned from vacation.
>
>> FN3  Dr. Tucker planned to testify about appellant's "prior psychiatric condition" and how his use of alcohol and drugs, in connection with his condition, would affect appellant's "mental ability" and the formation of the intent to commit the alleged crimes. Dr. Tucker told counsel about the vacation before trial began, but the vacation was not an issue at that time because the case was to be tried in late May or early June 2010.
>
> The court rejected this suggestion and denied counsel's request for a continuance. The court explained, "I don't see any real reason why someone else cannot come into this case, review the reports of the prison health service and whatever other materials that Dr. Tucker has reviewed, review Dr. Tucker's report, perhaps talk to Dr. Tucker. He or she would be in a way perhaps even a more advantageous position than Dr. Tucker himself." FN4  The court noted, "it's not at all unusual to get another expert to stand in for someone. There's plenty of time remaining to accomplish that. . . . We haven't even picked a jury yet."
>
>> FN4  Dr. Tucker had not yet prepared a report.

6

The prosecution completed its case on July 22, 2010.  A few days later, Dr. Jeffrey Gould testified on appellant's behalf "in the area of the effects of drug and alcohol abuse, and the state of one's mental state."  Dr. Gould, a board certified forensic psychiatrist and an assistant professor at the University of California, San Francisco, described his extensive experience completing court-ordered evaluations and testifying as an expert in criminal cases.

Dr. Gould testified he spoke to Dr. Tucker and reviewed various case-related documents, including transcripts of witness interviews and the record of appellant's criminal history.  Dr. Gould also reviewed appellant's medical records, records from the California Department of Social Services, and notes from Dr. Tucker's interview with appellant.  Medical records indicated appellant was diagnosed with "[o]veranxious disorder of childhood, attention deficit hyperactivity disorder and considered oppositional defiant standard" and a "specific developmental disorder not otherwise specified."

After interviewing appellant, Dr. Gould concluded he suffered from cocaine, marijuana, and alcohol dependence.  Dr. Gould determined appellant was not psychotic and did not suffer from a psychotic disorder, but opined appellant could have experienced psychotic symptoms when he used cocaine.  Dr. Gould noted "there is no documentation of Mr. Woods suffering psychotic symptoms . . . in any of the mental health records. . . ."  Dr. Gould explained that appellant "told Dr. Tucker that he experienced both hearing voices as well as seeing things since a young age, and becoming paranoid" and that these symptoms were "greatly exacerbated when he used cocaine."  Dr. Tucker did not opine on the veracity of appellant's statements.

Dr. Gould testified appellant had suffered head injuries, but concluded these injuries did not affect appellant's behavior.  FN5 He noted, however, that a person who has suffered a head injury and who uses stimulants may "get more impulsive" and have "reflective delay."  Dr. Gould noted the absence of evidence regarding the quantity of drugs or alcohol in appellant's system at the time of the offenses.

> FN5  If Dr. Gould had possessed more time before testifying, he would have had appellant undergo a neurological test to determine the extent of his head injuries.

*Woods*, A129592 at 8-10 (footnotes in original).

The Court of Appeal denied Woods' ineffective assistance of counsel claim because he did not demonstrate that counsel's failure to remember the dates of Dr. Tucker's vacation prejudiced him.  *Id.* at 12.  It denied the claim based on the trial court's denial of his request for a continuance on the ground that the trial court properly considered the competing concerns of the expert witness's vacation with the effect a continuance would have on the jurors and on the

administration of justice in a case that had been pending for almost five years.  *Id.* at 11.  It also found no prejudice because trial counsel retained Dr. Gould, "an amply qualified" expert,  who had sufficient time to review Woods' medical records, interview him and formulate an opinion about Woods' substance abuse and mental health issues.  *Id.*

### B. Claim of Ineffective Assistance of Counsel

#### 1. Legal Standard

To prevail on a Sixth Amendment claim for ineffectiveness of counsel, a petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings.  *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1410-11 (2011); *Premo v. Moore*, 131 S.Ct. 733, 740 (2011).  The general rule of *Strickland*, *i.e.*, to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA."  *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011).

#### 2. Analysis

As Woods himself admits, Dr. Tucker's vacation, which was set for late July, was not an issue at first because the trial was first scheduled for late May or early June.  *Id.*  However, when the trial date was extended to mid-June or early July, Dr. Tucker's July vacation made it

8

United States District Court
Northern District of California

1   impossible for him to testify.  *Id.*  However, as soon as counsel discovered the scheduling conflict,

2   he argued passionately and cogently for a continuance.  *Woods*, A129592 at 9.  That the court

3   denied his motion for a continuance was not due to counsel's failure to present a convincing

4   argument.  Furthermore, after the court denied the motion, counsel hired Dr. Gould, an "amply"

5   qualified expert in the field of forensic psychiatry with extensive experience completing court-

6   ordered evaluations and testifying as an expert in criminal cases.  *Id.*  Therefore, although counsel

7   forgot about Dr. Tucker's vacation plans when the trial was rescheduled, his later conduct in

8   arguing for a continuance and then hiring Dr. Gould, a qualified expert, demonstrates counsel's

9   effective performance.

10          Furthermore, as reasonably found by the Court of Appeal, Woods cannot demonstrate

11   prejudice from counsel's oversight.  Dr. Gould testified that he spoke to Dr. Tucker and reviewed

12   Dr. Tucker's records.  6 RT 1334-37.  Although Dr. Gould testified that Woods did not present

13   symptoms of psychosis and that the medical records lacked evidence that Woods suffered from

14   psychosis, there is no evidence that Dr. Gould would have testified otherwise.  6 RT 1337, 1353.

15   Furthermore, Dr. Gould supported Woods' defense with his testimony that Woods suffered from

16   cocaine, marijuana and alcohol dependence and that, although he was not psychotic, he could

17   experience psychotic symptoms when he used cocaine.  Dr. Gould also testified that Woods

18   suffered from head injuries and that a person who has a head injury and who uses stimulants may

19   get more impulsive and experience "reflective delay."  6 RT 1359.  Woods' claim that Dr.

20   Tucker's testimony would have been more convincing because he had been working with Woods

21   for over one year, whereas Dr. Gould only interviewed him for three hours, is based on

22   speculation.

23          Accordingly, it was not unreasonable for the state court to rule that trial counsel was not

24   ineffective, and that in any event counsel's performance did not prejudice Woods.

25       **C. Denial of Continuance**

26          Although Woods and Respondent characterize this claim as one of ineffective assistance of

27

28

1   counsel, it is more appropriately considered a due process claim.[1]

2          "The matter of a continuance is traditionally within the discretion of the trial judge, and . . .

3   not every denial of a request for more time . . . violates due process . . . . Contrariwise, a myopic

4   insistence upon expeditiousness in the face of a justifiable request for delay can render the right to

5   defend with counsel an empty formality.  There are no mechanical tests for deciding when a denial

6   of a continuance is so arbitrary as to violate due process.  The answer must be found in the

7   circumstances present in every case, particularly in the reasons presented to the trial judge at the

8   time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (citations omitted).  Even

9   if a continuance has been denied improperly, habeas relief is not available unless there is a

10  showing of actual prejudice to the petitioner's defense.  *Gallego v. McDaniel*, 124 F.3d 1065,

11  1072 (9th Cir. 1997).

12         As discussed above, Woods has not shown that Dr. Tucker's failure to testify caused actual

13  prejudice to his defense.  Therefore, even if the trial court improperly denied Woods' motion for a

14  continuance (which does not appear to be the case), the claim fails for lack of prejudice.

**III. Erroneous Jury Instruction**

16         Woods argues a portion of CALJIC No. 5.17, the jury instruction on imperfect self-

17  defense, is erroneous under state law because it failed to take into account his "subjective belief as

18  to the situation" and unconstitutionally lowered the prosecution's burden of proving beyond a

19  reasonable doubt "the absence of imperfect self-defense."

20         The Court of Appeal rejected this argument on the grounds that: (1) the jury instruction

21  was a correct statement of California law; and (2) in any event, any error was harmless because no

22  evidence supported an imperfect self-defense instruction.  *Woods*, A129592 at 12-15.  On federal

23  habeas review, a claim based on a state court's interpretation of its own law and its own jury

24  instructions is not cognizable.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (that an instruction

25  _____

26  [1]The California Court of Appeal did not expressly indicate it was deciding a Sixth Amendment
    ineffective assistance of counsel claim with regard to the assertions that the trial court improperly

27  denied a continuance.  It can be assumed the court addressed it as a federal due process claim.
    *See Johnson v. Williams*, 133 S.Ct. 1088, 1096 (2013) (when state court rejects federal claim

28  without expressly addressing it, federal habeas court must presume federal claim was decided on
    the merits).

was incorrect under state law provides no basis for habeas relief); *see also Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (state court's determination that, under state law, insufficient evidence warranted a defense instruction, was dispositive of instructional error claim). Therefore, Woods' argument that the Court of Appeal improperly applied California law does not create a basis for federal habeas relief.

Furthermore, any error was harmless because the evidence did not support Woods' claim of imperfect self-defense. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (petitioner not entitled to relief unless instructional error "had substantial and injurious effect or influence in determining the jury's verdict"). As explained by the Court of Appeal, for a killing to be in unreasonable self-defense, the defendant must subjectively believe he is in danger of imminent harm, even if the belief is unreasonable. *Woods*, A129592 at 15. In his petition, Woods argues that the evidence that he was intoxicated and suffered from drug induced paranoia was sufficient to show an unreasonable belief that he was in imminent harm. Pet. at 20. However, the only witness for the defense was Dr. Gould, who testified that, although it was possible that cocaine-induced psychotic symptoms may have been present in Woods at the time he killed Sills and Allen, there was no evidence regarding the quantity of alcohol, cocaine, heroin or marijuana in Woods' system at the time he committed the offenses. 6 RT 1365. Woods points to no other evidence supporting his claim that he subjectively believed he was in imminent danger of harm at the time he killed his two victims. Because of the lack of evidence supporting a claim of imperfect self-defense, any error regarding the jury instruction did not have a substantial and injurious effect or influence in the determining the jury's verdict.

## IV. Ineffective Assistance of Appellate Counsel

Woods claims appellate counsel was ineffective for failing to raise on appeal: (1) a claim under *Brady v. Maryland*, 373 U.S. 83 (1963) regarding the "hit list;" and (2) a claim that extra security at trial biased the jury.

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, meaning that the petitioner must show deficient performance and prejudice. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628

F.3d 1101, 1106 (9th Cir. 2010). Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Prejudice is shown by the petitioner's demonstrating a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

### A. *Brady* Claim

The facts relevant to this claim are as follows: On July 11, 2007, a sheriff's deputy at the jail where Woods was held pending trial confiscated a hit list passed from Woods' cell to an inmate standing outside the cell. 3 RT 758-59; 762-63; 767-68. The list was turned over to the police sergeant in charge of investigating Woods' case. 6 RT 1234. On April 7, 2010, the list was turned over to the prosecutor in Woods' case. 1 RT 47. She immediately notified defense counsel about the list and, on April 10, 2010, defense counsel received a copy of the list from the District Attorney's Office. 1 RT 47-50. On June 14, 2010, Woods' trial began. 2 CT 332-33. The next day, at a hearing on motions in limine, defense counsel indicated he would be bringing a *Brady* motion regarding the withholding of the hit list. 1 RT 46. However, defense counsel filed a motion to exclude the hit list based on the prosecutor's failure to comply with the state's discovery statute, California Penal Code section 1054.5(b). 2 CT 410-15. At the motion hearing, the prosecutor argued *Brady* was inapplicable because the hit list did not contain exculpatory evidence. 1 RT 206-08. Defense counsel disavowed his earlier comments regarding a *Brady* violation, pointing out his motion was for a violation of the discovery statute. 1 RT 212-13. Responding to the discovery motion, the prosecutor pointed out that the discovery statute required disclosures at least thirty days prior to trial, that the trial began on June 14, 2010 and defense counsel received the hit list on April 10, 2010. 1 RT 218. The prosecutor also stated that, as soon as she received the hit list, she turned it over to the defense. 1 RT 218-19. The trial court found no *Brady* violation and no violation of the discovery statutes or of the court's discovery order. 1 RT 228, 238-40; 245-46.

1   The state Superior Court denied Woods' *Brady* claim in one sentence:  "Petitioner has

2   failed to state a prima facie case for relief."  Ex. 12, *In re Woods*, No. 157467 at 3.

3   Because the hit list contained inculpatory rather than exculpatory evidence, the *Brady*

4   claim fails.  *See Stickler v. Greene*, 527 U.S. 263, 281-82 (1999) (*Brady* claim requires withheld

5   evidence to be exculpatory or to provide grounds for impeaching a prosecution witness).

6   **B. Jury Bias**

7   The facts relevant to this claim are as follows:  Before the evidentiary phase of the trial

8   was to begin, the trial court ordered two bailiffs to be present in the courtroom during the trial.

9   2 CT 448; 7 RT 1616.  After the jury rendered its guilty verdicts, defense counsel requested that

10  the court remove the two bailiff requirement because it was the reason Woods was kept in

11  administrative segregation in the jail.  7 RT 1606.  The trial court denied this request on the

12  grounds that, in light of the charges against Woods, it was appropriate to have two bailiffs at the

13  sentencing proceeding and that the sheriff's department was not under the jurisdiction of the court

14  and it could do whatever it deemed appropriate.  7 RT 1606.  Woods made the same request at his

15  sentencing hearing and the court denied it for the same reasons it previously stated.  7 RT 1617;

16  1620-21.  The court also noted for the record that Woods was never in the courtroom in shackles,

17  that the jury never saw him in shackles or that he was restrained physically in any way.  7 RT

18  1621-22.  The defense attorney pointed out that Woods was shackled when he was upstairs and

19  one juror saw him shackled.  7 RT 1622.  However, the court pointed out that there was no

20  evidence of this and defense counsel agreed.  7 RT 1622.

21  The Constitution forbids the use of shackles, or other physical restraints, visible to the jury

22  absent a trial court determination, in the exercise of its discretion, that the use is justified by an

23  essential state interest—such as the interest in courtroom security—specific to the defendant on

24  trial. *Deck v. Missouri*, 544 U.S. 622, 624 (2005).  However, a jury's brief or inadvertent glimpse

25  of a defendant in physical restraints outside the courtroom does not warrant habeas relief unless

26  the petitioner shows prejudice.  *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2002); *see also*

27  *Ghent v. Woodford*, 279 F.3d 1121, 1133 (9th Cir. 2002) (no prejudice from jury's brief view of

28  shackles outside of courtroom while petitioner was being transported).

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As the state habeas court reasonably found, in light of the evidence that Woods had committed two murders and he had ordered "hits" on prosecution witnesses, the use of two bailiffs in the courtroom was warranted.  In rejecting Woods' argument that prejudice from the bailiffs' presence was shown by the jurors' notes expressing concern for their safety, the state habeas court reasonably found that the jurors' concerns arose from the evidence that Woods had killed two people and sought to eliminate witnesses against him rather than from the presence of the bailiffs.  Furthermore, Woods' claim of prejudice based on two jurors seeing him in handcuffs outside the courtroom is without merit.  *See Williams*, 384 F.3d at 593 (jurors' brief glimpse of defendant in physical restraints outside courtroom does not warrant habeas relief).

Because Woods argues that appellate counsel should have raised meritless claims, his claim of ineffective assistance of appellate counsel fails.  *See Jones*, 463 U.S. at 75-54 (no constitutional duty for appellate counsel to raise meritless claims); *Miller*, 882 F.2d 1434 (weeding out of weaker issues is hallmark of effective appellate advocacy).

## CONCLUSION

Based on the foregoing, the Court orders as follows:

1. Woods' petition for a writ of habeas corpus is denied.  A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

2. The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED**.

Dated: April 28, 2015

_____
VINCE CHHABRIA
United States District Judge

1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    MICHAEL WOODS,                      Case No.  13-cv-00009-VC

                Plaintiff,
8
                                         **CERTIFICATE OF SERVICE**
      v.
9
    TIM VIRGA,
10
                Defendant.
11

12         I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S.
    District Court, Northern District of California.
13

14         That on 4/28/2015, I SERVED a true and correct copy(ies) of the attached, by placing said
    copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing
15  said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
    located in the Clerk's office.
16

17  Michael  Woods ID: AE8112
    Sierra Conservation Center
18  5150 O'Byrnes Ferry Rd
    Jamestown, CA 95237
19

20

21  Dated: 4/28/2015

22

23                                       Richard W. Wieking
                                         Clerk, United States District Court
24

25

26  By:_____
                                         Kristen Melen, Deputy Clerk to the
27                                       Honorable VINCE CHHABRIA

28

                                   15